POSNER, Circuit Judge,
dissenting.
The defendant pleaded guilty to wire fraud in violation of 18 U.S.C. § 1343. The district judge sentenced him to 24 months in federal prison and also ordered him to pay restitution to the victims' of the fraud — but that aspect of the sentence is not involved in his appeal. Because of the defendant’s very poor health — he suffers from a rare form of leukemia (called ima-tinib-resistant chronic myelogenous leukemia), compounded by bipolar disorder with manic episodes, chronic arthritis, hypertension, and asthma — the probation service had recommended that the judge impose in lieu of a prison sentence a sentence of 3 years’ probation, including 12 months of home confinement and 12 months of confinement in a halfway house, because it would be easier to provide for his medical needs in such locations. He is not violent; he was on pretrial release for two and a half years after his arrest and committed no crimes during that period.
In appealing the judge’s sentence he argues that the Bureau of Prisons can’t guarantee that he will receive adequate medical attention in a prison. He is right. The drug that he’s been receiving for his leukemia is called nilotinib (trade name Tasigna). It is very expensive — more than $100,000 for a year of treatment. Perhaps *704 because of its cost, it is not currently listed on the National Drug Formulary of the Bureau of Prisons. (A drug formulary is a list of prescription drugs that is used by practitioners to identify drugs that offer the greatest overall value.) The Bureau has sometimes provided nilotinib for prisoners suffering from ailments such as the kind of leukemia that the defendant suffers from, but it has refused to commit to providing it to this defendant. A letter sent by a doctor employed by the Bureau to one of 'the prosecutors in the case states that “while nilotinib is not included in the National - Formulary, this medication has been approved for inmates with medical conditions similar to Mr. Rothbard’s.” But how similar the other inmates’ conditions are to Rothbard’s — whether for example they require as frequent dosages of nilotin-ib as he does — is nowhere indicated. In addition the Bureau has refused to allow the defendant’s need for the drug to be determined by a medical examination prior to his imprisonment, even though the results of such an examination might both vindicate the probation service’s recommendation for nonprison confinement and resolve the question of his need to continue taking nilotinib.
The defendant’s bipolar disorder with manic episodes (bipolar disorder used to be called manic depression) should also be examined before he’s imprisoned, because it’s a disorder that might be difficult to treat effectively in a prison without placing the defendant in a cell by himself (perhaps even solitary confinement), as manic episodes might upset and alarm cellmates and even prison staff, though it is now believed that solitary confinement is detrimental to a prisoner’s mental health. See, e.g., PBS Frontline, “What Does Solitary Confinement Do To Your Mind?,” www.pbs.org/ wgbb/frontline/article/what-does-solitary-confinement-do-to-your-mind/ (visited March 17, 2017, as were the other websites cited in this opinion).
Essentially the prosecution, the district court, and now my colleagues, ask that the Bureau of Prisons be trusted to give the defendant, in a federal prison, the medical treatment that he needs for his ailments. Yet it is apparent from the extensive literature on the medical staff and procedures of the Bureau of Prisons (a literature ignored by my colleagues) that the Bureau cannot be trusted to provide adequate care to the defendant. The defendant’s expert, Phillip Wise, who has extensive experience with the medical care provided to federal prisoners' — -he has served as the Assistant Director of the Federal Bureau of Prisons, with responsibility for health care, as the Warden of the Federal Medical Center (a Bureau of Prisons facility) in Rochester, Minnesota, and as the vice president of a company that provides medical care to federal prisoners — tells us “there is no assurance that nilotinib will, in fact, be provided for Mr. Rothbard,” and the fact “that nilo-tinib has been approved for some inmates in the past is not an assurance that it will be provided for Mr. Rothbard without some delay as the request is evaluated or some other medication is tried first.” Wise also points to “the very real difficulty the BOP has in recruiting and maintaining medical staff for its facilities,” which he says “may lead to delays in care as well as provision of essential medical care by lower level medical staff.”
A national survey of inmates in federal, state, and local prisons found that “among inmates with a persistent medical problem, 13.9% of federal inmates, 20.1% of state inmates, and 68.4% of local jail inmates had received no medical examination since incarceration. More than [20 percent of] inmates were taking a prescription medication ... when they entered prison or jail; of these, 7232 federal inmates (26.3%), *705 80,971 state inmates (28.9%), and 58,991 local jail inmates (41.8%) stopped the medication following incarceration. Prior to incarceration slightly more than [14 percent of] inmates were taking a prescription medication for an active medical problem' routinely requiring medication.... Of these, 20.9% of federal inmates, 24.3% of state inmates, and 36.5% of local- jail inmates stopped the medication following incarceration. Andrew P. Wilper, et al, “The Health and Health Care of US Prisoners: Results of a Nationwide Survey,” 99 Am. J. Public Health 666, 669 (2009), https:// www.ncbi.nlm.nih.gov/pmc/articles/PMC 2661478/. The authors conclude that “many inmates with a serious chronic physical illness fail to receive care while incarcerated.” Id. at 666.
These problems have been documented by federal agencies. A 2016 report by the Justice Department’s Office of the Inspector General on the BOP’s medical staffing concluded — -echoing Wise’s concerns — that “recruitment of medical professionals is one of the BOP’s greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs,” and that “recruitment and retention of medical professionals is a serious challenge for the BOP, in large part because the BOP competes with private employers that offer higher pay and benefits. We further found that the BOP has not proactively identified and addressed its medical recruiting challenges in a systemic way. Rather, it has attempted in an uncoordinated fashion to react to local factors influencing medical recruiting at individual institutions.” Office of the Inspector General, U.S. Department of Justice, “Review of the Federal Bureau of Prisons’ Medical Staffing Challenges,” pp. i-ii, March 2016, https://oig.justice.gov/ reports/2016/el602.pdf.
A 2008 report by the same office on medical care in the BOP concluded that “each of the BOP institutions we tested did not always provide recommended preventive health care to inmates. Our audit found that for almost half of the preventive health services we tested, more than 10 percent of the sampled inmates did not receive the medical service.... The BOP (1) did not develop agency-wide guidance to correct apparent systemic problems found during medical-related internal reviews and external audits; (2) did not provide health care providers with current authorization to practice medicine on BOP inmates through privileges, practice agreements, or protocols; (3) had not performed required initial and renewal peer reviews for providers; and (4) had not implemented an effective performance measurement system related to the provision of health care at BOP institutions.” Office of the Inspector General, U.S. Department of Justice, “The Federal Bureau of Prisons’ Efforts to Manage Inmate Health Care,” p. in, Feb. 2008, https://www.oig.justice. gov/reports/BOP/a0808/final.pdf.
These are long-standing problems. A GAO report on health care in the BOP, published in 1994, concluded that “inmates with special needs, including women, psychiatric patients, and patients with chronic illnesses, were not receiving all of the health care they needed at the three medical referral centers we visited. This situation was occurring because there were insufficient numbers of physician and nursing staff to perform required clinical and other related tasks.... As a result, some patients’ conditions were not improving and others were at risk of serious deterioration.” U.S. General Accounting Office, “Bureau of Prisons Health Care: Inmates’ Access to Health Care is Limited by Lack of Clinical Staff,” p. 2, *706 Feb. 1994, www.gao.gov/assets/220/219296. pdf.
The problems of BOP health care may soon become even more serious, given the decision by the new Attorney General, Jeff Sessions, to continue confining some federal prisoners in privately owned prisons. See Eric Tucker, “U.S. will continue use of privately run prisons, Attorney General says,” Feb. 23, 2017, PBS Newshour, The Rundown, www.pbs.org/newshour/ rundown/u-s-will-continue-use-privately-run-prisons-attorney-general-says/. The bad reputation of those prisons had caused the previous Administration to begin phasing out confinement of federal prisoners in them. See Memorandum from Sally Q. Yates, Deputy Attorney General, to the Acting Director, Federal Bureau of Prisons (Aug. 18, 2016), -www.justice.gov/ archives/opa/file/886811/ download; Office of the Inspector General, U.S. Department of Justice, “Review of the Federal Bureau of Prisons’ Monitoring of Contract Prisons,” Aug. 2016, https://oig.justice.gov/ reports/2016/el606.pdf.
I am mindful that if Rothbard is denied nilotinib in prison he can invoke the BOP’s grievance process. But how long will that take? We’re not told, and Dr. Cripe, Roth-bard’s physician, warns that any “prolonged interruption” in Rothbard’s access to nilotinib will endanger his health.
To conclude, my inclination would be to reverse the judgment of the district Court with directions to impose the sentence recommended by the probation service. But I would be content to reverse and remand with instructions that the district judge appoint • neutral expert witnesses drawn both from the medical profession and from academic analysis of prison practices and conditions, with particular emphasis on the federal prison system, and that the judge reconsider his sentence in light of evidence presented by these witnesses as well as any witnesses that the government or the defendant may care to call.
What is clear is that Jeffrey Rothbard is entitled to a more informed and compassionate judicial response to his physical and mental illnesses than he has received from the district court and this court.